UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - x

MICHAEL CARBONI and
C.O.M. TRADING, INC.,

        Plaintiffs,

— against —

BOB LAKE and R.J. O'BRIEN &
ASSOCIATES, INC.,

        Defendants.

- - - - - - - - - - - - - - - - - - - x

06 Civ. 15488 (RJH)

ECF Case

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
MOTION FOR A STAY PENDING ARBITRATION**

MAYER, BROWN, ROWE & MAW LLP

**1675 BROADWAY**
NEW YORK, NEW YORK 10019
(212) 506-2500

### MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR A STAY PENDING ARBITRATION

Defendants respectfully submit this memorandum of law in support of their motion for a stay of this action in favor of compulsory member-member arbitration under the rules of the New York Mercantile Exchange ("NYMEX" or the "Exchange").

### Preliminary Statement

One member of the Exchange, plaintiff Michael (Oscar) Carboni, sent an email falsely accusing another member of the Exchange, defendant R.J. O'Brien & Associates, Inc. ("RJO") of failing to execute an Exchange transaction. An RJO officer, defendant Robert M. (Bob) Lake, responded with a reply-to-all email denying that RJO had had any role in the botched trade and denouncing Carboni as a "scumbag." Carboni claims that Lake's email defamed him, and that Carboni's Exchange business has been destroyed.

This is therefore a paradigmatic intramural member-member dispute subject to compulsory arbitration under NYMEX rules. However, plaintiffs' attorneys have refused to dismiss or to stay the litigation in favor of arbitration. *See* Affidavit of Michael O. Ware, sworn to March 16, 2007 ("Ware Aff.") ¶ 3. In compliance with the non-discretionary mandate of Section 3 of the Federal Arbitration Act, 9 U.S.C. § 3, the Court must therefore impose the stay to which plaintiffs will not stipulate.

### The Parties and the Exchange

RJO is a futures commission merchant registered with the Commodity Futures Trading Commission and the National Futures Association. Affidavit of Robert M. Lake, sworn to March 15, 2007 ("Lake Aff.") ¶ 2. A futures commission merchant, or

"FCM," is the commodity futures market analog to the securities brokerage house. *Id.* An FCM solicits, accepts, enters and clears orders for the purchase or sale of commodity futures and options contracts, and it accepts payment from (or extends credit to) those whose orders are accepted. *Id.*

RJO is a clearing member of NYMEX. *Id.* ¶ 3. A clearing member is a member of an exchange clearing house responsible for the financial commitments of its customers. *Id.* All trades of a non-clearing member must be registered and eventually settled through a clearing member. *Id.* Today, NYMEX order execution is increasingly electronic. *Id.* ¶ 4. Historically, however, clearing members used independent floor brokers to execute or "fill" orders on the floor of the Exchange. *Id.*

At all relevant times, and at least into 2006, plaintiff Michael (Oscar) Carboni was a member of the Exchange who worked as a floor broker for NYMEX clearing members, including RJO. *Id.* ¶ 5.

### The Action and the Email String

The Amended Complaint, Ware Aff. Ex. 1, purports to allege defamation and "Tortious Interference with a Business and/or Contract," and Carboni claims to have been "rendered completely powerless to engage in any form of trading, with any client, for his own benefit, in the Commodity Future Exchange." *See* Am. Cmplt. ¶ 15. Carboni alleges only one act by RJO or Lake against him, the publication of a single email. Lake and RJO are alleged to have said:

> I do not do business with scumbags that try to generate business off other people's perceived misfortune. This little prick can twist in the wind before he touches one piece of RJO paper. I am now in the process of burying this guy in the pit and on Comex in general, let's see how good the fills are when no one will trade with him.
>
> Bob Lake

2

Am. Cmplt. ¶ 3.

The text alleged in the Amended Complaint is an excerpt from an email Lake sent, which in turn is part of an eleven email string. Lake Aff. ¶ 6. The string is reproduced as Exhibit A to the Lake Affidavit To facilitate discussion of the string, in Exhibit B to the Lake Affidavit we have rearranged the eleven emails into chronological order and numbered them Email Nos. 1-11.

Email No. 1, sent December 7, 2005, is from Barry Isaacson of Alaron Trading Corporation ("Alaron"). *See* Lake Aff. ¶ 7. Alaron is a non-clearing member of the Exchange. *Id.* In December 2005, Alaron was in the process of moving its clearing business to RJO from another clearing member. *Id.* In Email No. 1, Isaacson is discussing logistics of the move to RJO with an Alaron customer named Ira Epstein, who was interested in having Carboni do the floor brokerage for his trades through Alaron. *Id.*

RJO, as the clearing member handling Alaron's business, would ordinarily be responsible for routing trades to floor brokers. *Id.* ¶ 8. Epstein's request that his trades be routed to Carboni therefore had to be approved and implemented by RJO. Email Nos. 2-5, also from December 7, 2005, reflect a discussion among Epstein, Carboni and Isaacson on the Epstein proposal to use Carboni. *Id.* ¶ 9. Lake was copied on Email Nos. 5 and 6.

On the morning of December 13, 2005, Isaacson of Alaron sent Email No. 6 to Epstein, copying Lake and others, and asking Epstein to confirm understandings on cost and liability issues associated with Epstein's possible use of Carboni. *Id.* ¶ 10.

Epstein responded later that morning with Email No. 7. In Email No. 7, Epstein agreed on liability issues and asked Isaacson to elaborate on what costs might be

3

presented. He also claimed to forward a message from Carboni which Epstein called "scary if true." The forwarded text appearing in Email No. 7 said:

> Ira,
>
> Yesterday in the Silver futures RJO is so buried with paper they forgot, that's right forgot to execute buying 600 march silver @ 877.00. It cost them 390,000.00. Please be careful using them for executions as they are way to [sic] busy to handle the paper load and continue to pick up old refco business as of this writing. I hope we can get our business completed this week and get you away from that atmosphere[.] I will contact Bob Lake today. I[']ll keep you informed.
>
> Oscar Carboni
> President, C.O.M. Trading Inc.

Isaacson's response to Email No. 7 was Email No. 8, which he sent at 10:36 A.M. E.S.T. the same day. Email No. 8 was copied to Carboni and Lake, asking them to "confirm that there are no costs." Isaacson also mentioned that he had not heard anything about the error Carboni alleged.

Carboni's charge in Email No. 7 that RJO had failed to execute a transaction was entirely false. Lake Aff. ¶ 13. A trading error had indeed occurred that day, but it was a pit broker's error and did not even involve an RJO customer. *Id.* Lake responded immediately and at 10:47 A.M. E.S.T. that morning sent Email No. 9, the email excerpted in the Amended Complaint. (Email No. 9 in Lake Aff. Exhibit B carries a time stamp of 9:47 A.M., because that is how it displayed on Epstein's computer in Chicago: 10:47 A.M. Eastern time is 9:47 A.M. Central time. *See id.*)

Lake sent Email No. 9 to set the record straight, copying everyone who had received Email No. 8 and explaining that RJO had nothing to do with the error Carboni falsely ascribed to RJO. *See* Lake Aff. ¶ 14. Lake also called Carboni a "scumbag" for trying "to generate business off other people's perceived misfortune," which is what Lake

4

thought Carboni was doing in sending his false report to Epstein. *Id.* Epstein responded to Email No. 9 in a private email to Lake, Email No. 10, saying that he was "certain [Carboni] did not do this in a harmful way." Lake's reply, Email No. 11, concluded the email string of December 7 and 13, 2005, with Lake telling Epstein that he was "all for moving on, principles over personalities."

This action followed nearly a year later, just inside the CPLR 215(3) limitation period for defamation.

**Argument**

**THE ACTION MUST BE STAYED IN FAVOR
OF EXCHANGE ARBITRATION**

Section 3 of the Federal Arbitration Act, 9 U.S.C. § 3, provides that the courts "shall" stay any action on an issue subject to an arbitration agreement. The Court must first determine whether there is an arbitration agreement, and then undertake the "separate and independent" inquiry to determine "whether a given dispute falls within the scope of that agreement." *Spear, Leeds & Kellogg v. Central Life Assurance Co.*, 85 F.3d 21, 25 (2d Cir. 1996).

**1.    An Arbitration Agreement Exists**

The Court of Appeals has "held that the arbitration rules of an exchange are sufficient to compel arbitration of exchange-related disputes [even] in the absence of a specific written arbitration agreement" directly between the parties to the dispute. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Georgiadis*, 903 F.2d 109, 113 (2d Cir. 1990) (emphasis removed). NYMEX Rule 5.04(A), *available at* nymex.com/rule_main.aspx, requires the arbitration of disputes between members and member firms "wholly or partially arising, directly or indirectly, out of, in connection with, or as a result of … [a]ny

transaction executed on the Exchange" and "[t]he business of such Member or Member Firm on the Exchange." An arbitration agreement therefore exists.

**2.    Plaintiffs' Claims Are Squarely Within The Scope Of The Agreement**

"[A]s a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25, 103 S. Ct. 927, 941 (1983). "Another way of expressing this is to say that arbitration must not be denied unless a court is positive that the clause it is examining does not cover the asserted dispute." *Spear Leeds*, 85 F.3d at 28. Against this legal backdrop, it is clear that this dispute is within the scope of the agreement. Lake's allegedly tortious statements were made in direct response to Carboni's accusation regarding a transaction that was executed on the floor of the Exchange, and this action thus arises that out of transaction within the meaning of Rule 5.04(A)(1). Second, the dispute in this case stemmed from Epstein's request that Carboni be his exclusive floor broker for certain trades to be executed on the Exchange and arose out of business efforts to accommodate that request. Lake was defending RJO's reputation at the Exchange. The business plaintiffs claim to have lost is entirely Exchange-related. Am. Cmplt. ¶¶ 14-15. Accordingly, Plaintiffs' claims also arose in connection with the parties' business on the Exchange within the meaning of Rule 5.04(A)(2).

**3.    The Presence Of COM And Lake Does Not Change The Result**

The caption names two plaintiffs: Carboni and his company, C.O.M. Trading, Inc. ("COM," presumably Michael (Oscar) Carboni's initials in reverse). The Amended Complaint, while sometimes referring to "plaintiffs" in the plural, nevertheless speaks generally in terms of "he" and "him" and "his." *See*, *e.g.*, Am. Cmplt. ¶ 2 ("he has conducted …"; "his dealings … as a commodities trader [and] businessman"); ¶ 6 ("his

workplace and his private life").  COM is alleged to be a New York corporation headquartered in Staten Island, where Carboni lives, Am. Cmplt. ¶ 1, and to be "in business," *id.* ¶ 2.  Beyond that, the Amended Complaint sheds little light, and RJO does not know what COM is.  Lake Aff. ¶ 5.  (We have confirmed COM's corporate existence, Ware Aff. ¶ 4 & Ex. 2, although we could not confirm the existence of the address on file with the secretary of state.)

The cases recognize a number grounds on which to hold non-signatories to arbitration agreements.  Carboni signed the false allegation against RJO repeated in Email No. 7 as "President C.O.M.Trading inc".  Purporting to doing Exchange business in this fashion should estop COM from denying the obligation to arbitrate because it has received benefits flowing directly from Carboni's NYMEX membership.  The Court of Appeals has concluded that, where a company "knowingly accepted the benefits" of an agreement with an arbitration clause, even without signing the agreement, that company will bound by the arbitration clause.  *Deloitte Noraudit A/S v. Deloitte Haskins & Sells*, U.S., 9 F.3d 1060, 1064 (2d Cir.1993) (internal quotation marks and citation omitted).  In *Deloitte*, a nonsignatory which had a copy of the agreement, raised no objections to it and availed of its benefits was estopped from arguing it was not bound by the arbitration clause in the agreement.  *Deloitte*, 9 F.3d at 1064.  COM likewise appears to have done exchange business in association with Carboni and cannot claim not to be bound by the agreement that binds him.  Additionally or alternatively, COM would appear to be an alter ego or agent of Carboni, and bound to the arbitration agreement on that basis alone.

Lake is a beneficiary of Carboni's arbitration agreement, and is therefore entitled to enforce it.  *See*, *e.g.*, *Spear Leeds*, 85 F.3d at 26.

## Conclusion

The Court should stay this action pending NYMEX arbitration.

Dated:   New York, New York
        March 16, 2006

                            Respectfully submitted,

                            MAYER, BROWN, ROWE & MAW LLP

                            By: _____
                                  Michael O. Ware (MW-0290)

                            1675 Broadway
                            New York, N.Y. 10019
                            (212) 506-2500

                            *Attorneys for defendants Bob Lake and R.J.*
                                 *O'Brien and Associates, Inc.*

*Of Counsel:*

    Erica E. Flores